IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-26

No. 127A20

Filed 19 March 2021

IN THE MATTER OF: H.A.J. and B.N.J.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 14 January 2020 by Judge Hal Harrison in District Court, Madison County. This matter was calendared for argument in the Supreme Court on 11 February 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Law Offices of Jamie A. Stokes, PLLC, by Jamie A. Stokes, for petitioner-appellee Madison County Department of Social Services.*

*Michelle FormyDuval Lynch, for appellee Guardian ad Litem.*

*Deputy Parent Defender Annick Lenoir-Peek for respondent-appellant mother.*

EARLS, Justice.

¶ 1   Respondent, the mother of the juveniles H.A.J. and B.N.J. ("Holden" and "Bella")[1], appeals from the trial court's orders eliminating reunification as a permanent plan and terminating her parental rights. After careful review, we affirm the trial court's orders.

## I.   Background

---

[1] Pseudonyms are used in this opinion to protect the juveniles' identity and for ease of reading.

¶ 2        On 14 August 2018, the Haywood County Department of Social Services (DSS) received a report alleging that Holden and Bella were being left alone while respondent-mother visited Mr. Scott[2], with whom she was in a relationship. The report further alleged that Mr. Scott, who was in the hospital receiving treatment for abscesses due to intravenous drug use, had "gotten [respondent-mother] 'hooked' on Methamphetamine." Haywood County DSS contacted Madison County DSS seeking assistance, and Madison County DSS contacted the Madison County Sheriff's Office for assistance in locating Holden and Bella.

¶ 3        On or around 6 September 2018, the Madison County Sheriff's Office located Holden and Bella in Hot Springs, North Carolina, and notified Madison County DSS. Madison County DSS interviewed Holden and Bella, and the juveniles revealed they had been hiding and fleeing from law enforcement and DSS for multiple days to avoid being removed from respondent-mother's care. Holden and Bella disclosed that they had witnessed respondent-mother and Mr. Scott "shooting drugs with needles in their bodies." The juveniles also stated they had witnessed Mr. Scott "striking the respondent mother, slinging her on the bed[,] and the respondent mother screaming for [Holden and Bella] to call 911." Respondent-mother admitted to intravenous drug use and domestic violence between herself and Mr. Scott, including one occasion where Mr. Scott attempted to choke her in bed. Accordingly, on 7 September 2018,

_____

[2] Also a pseudonym, used in this opinion to preserve confidentiality.

Madison County DSS filed petitions alleging that Holden and Bella were neglected and dependent juveniles and obtained nonsecure custody.

Following a hearing held on 15 October 2018, the trial court entered an order on 7 November 2018 adjudicating Holden and Bella neglected juveniles. The trial court entered an interim disposition order in which it placed the juveniles in the legal and physical custody of Madison County DSS and granted respondent-mother weekly supervised visitation. On 26 November 2018, the trial court entered a disposition order in which it set the permanent plan for the juveniles as reunification with a concurrent plan of guardianship. The trial court ordered respondent-mother to comply with the requirements of her DSS case plan, which included: (1) completing the Children in the Middle Parenting Course and Seeking Safety classes; (2) having no contact with Mr. Scott; (3) attending a substance abuse intensive outpatient treatment program (SAIOP); (4) a medical evaluation; and (5) random drug screens.

The trial court held a review hearing on 21 February 2019. In an order entered on 21 March 2019, the trial court found that respondent-mother: (1) had resolved pending criminal charges by pleading guilty to breaking and entering, and was placed on probation; (2) had a positive screen for alcohol; (3) had participated in a domestic violence class but had not received an assessment; (4) had completed the Children in the Middle Parenting Course but not the Seeking Safety class; and (5) needed to complete SAIOP and submit to random drug and alcohol screening. The trial court

also found that Holden and Bella were doing well in their foster care placements but had some behavioral issues.

¶ 6     A permanency planning review hearing was held on 4 April 2019. The trial court found as fact that: (1) respondent-mother had not yet secured housing; (2) she had completed SAIOP and intermediate treatment was recommended; (3) despite treatment, respondent-mother continued to have issues with alcohol consumption; (4) respondent-mother had not yet completed the Seeking Safety class; and (5) respondent-mother had not yet received a domestic violence assessment. The trial court further found as fact that Bella was experiencing behavioral issues that were the result of prior trauma. Consequently, the trial court directed that respondent-mother's visitation with Bella "occur as therapeutically recommended."

¶ 7     The trial court held another permanency planning review hearing on 16 May 2019. On the day of the hearing, the attorney for DSS requested a change in the permanent plan for Holden and Bella to adoption with a concurrent plan of guardianship, and the attorney for the guardian ad litem concurred. Respondent-mother objected to the requested change, citing a lack of notice and due process concerns because DSS and the guardian ad litem had recently filed reports in which they had not recommended such a change. The trial court directed DSS to proceed.

¶ 8     The trial court entered an order from the hearing on 8 August 2019. In the permanency planning review order, the trial court found that since the last hearing

respondent-mother: (1) had not yet secured or maintained independent housing, had been kicked out of her prior residence, and was residing with her parents; (2) had missed scheduled visitations in April 2019 and on Mother's Day 2019; (3) was continuing to use alcohol in violation of a prior court order and had received a recent DWI charge which remained pending; (4) was currently on probation for breaking and entering; (5) did not have stable transportation; (6) had completed over ninety hours of SAIOP but had not participated in an aftercare program as recommended; (7) was substituting alcohol for methamphetamine use; (8) had not obtained a domestic violence assessment; and (9) had not started the Seeking Safety course. The trial court further found that the juveniles remained in licensed foster care and were doing well in their placement and in school. The trial court determined that the return of the juveniles to their home within six months was not likely and that further efforts at achieving reunification would be futile or inconsistent with the juveniles' need for a safe, permanent home within a reasonable period. Accordingly, the trial court relieved DSS of further reunification efforts and changed the permanent plan for the juveniles to adoption with a concurrent plan of guardianship. Respondent-mother filed notice to preserve her right to appeal.

¶ 9        On 28 June 2019, DSS filed petitions to terminate respondent's parental rights. On 14 January 2020, the trial court entered an order in which it determined that grounds existed to terminate respondent's parental rights to both juveniles due

to neglect. N.C.G.S. § 7B-1111(a)(1) (2019). The trial court further concluded it was in Holden's and Bella's best interests that respondent's parental rights be terminated. Accordingly, the trial court terminated respondent's parental rights.[3] Respondent-mother appeals.

## II. Permanency Planning Review Order

¶ 10    Respondent-mother first argues the trial court erred by denying her motion to continue the 16 May 2019 permanency planning review hearing. Respondent-mother contends that she relied on the representations made by DSS and the guardian ad litem in their written reports and was not provided sufficient notice that they would be requesting a change in the juveniles' permanent plan at the hearing. Respondent-mother argues that had she been aware that their recommendations would be changing, she would have had an opportunity to present evidence as to why reunification efforts should continue. Therefore, respondent-mother argues the trial court violated her constitutional right to due process.

¶ 11    "Ordinarily, a motion to continue is addressed to the discretion of the trial court, and absent a gross abuse of that discretion, the trial court's ruling is not subject to review." *In re A.L.S.*, 374 N.C. 515, 516–17 (2020) (quoting *State v. Walls*, 342 N.C. 1, 24 (1995)). "However, if 'a motion to continue is based on a constitutional right,

---

[3] The district court's order also terminated the parental rights of the juveniles' fathers, including unknown fathers, but the fathers did not appeal and are not a party to the proceedings before this Court.

then the motion presents a question of law which is fully reviewable on appeal.' " *In re S.M.*, 375 N.C. 673, 679 (2020). "To establish that the trial court's failure to give additional time to prepare constituted a constitutional violation, [the] [respondent-mother] must show 'how [her] case would have been better prepared had the continuance been granted or that [s]he was materially prejudiced by the denial of h[er] motion.' " *State v. McCullers*, 341 N.C. 19, 31 (1995) (quoting *State v. Covington*, 317 N.C. 127, 130 (1986)).

¶ 12        Here, the record demonstrates, and respondent-mother acknowledges in her brief, that the hearing was designated as a permanency planning hearing. Thus, respondent-mother was on notice that the trial court could change the permanent plan for the juveniles. *See* N.C.G.S. § 7B-906.2(a) (2019) ("At *any* permanency planning hearing pursuant to G.S. 7B-906.1, the court shall adopt one or more of the following permanent plans the court finds is in the juvenile's best interests: (1) Reunification[;] (2) Adoption[;] (3) Guardianship[;] (4) Custody to a relative or other suitable person[;] (5) Another Planned Permanent Living Arrangement (APPLA)[; or] (6) Reinstatement of parental rights[.]") (emphasis added). Although respondent-mother argues that DSS and the guardian ad litem should be required to give notice of a change in recommendations in advance of the permanency planning hearing, such notice is not required by Chapter 7B. Furthermore, even if respondent-mother had been notified of the change in recommendations, as the Court of Appeals has

observed, "North Carolina caselaw is replete with situations where the trial court declines to follow a DSS recommendation." *In re Rholetter*, 162 N.C. App. 653, 664 (2004).

¶ 13        We further note that after learning at the hearing that DSS and the guardian ad litem were seeking a change in the permanent plan for the juveniles, respondent-mother objected to the change in plan. While respondent-mother objected to the trial court changing the permanent plan for the juveniles at the hearing, the record does not reflect that counsel asked for the hearing to be continued. Even if we construe respondent-mother's objection as a request for a continuance, there is no evidence in the transcript demonstrating how respondent-mother was materially prejudiced by denial of the motion. *See In re A.L.S.*, 374 N.C. 515, 518 (2020) (concluding that respondent-mother failed to demonstrate prejudice where her "counsel offered only a vague description of the son's expected testimony and did not tender an affidavit or other offer of proof to demonstrate its significance."); s*ee also In re D.Q.W.,* 167 N.C. App. 38, 41 (2004) (concluding there was no prejudice where respondent did not explain why his counsel had inadequate time to prepare for the hearing; what specifically his counsel hoped to accomplish during the continuance; or how preparation would have been more complete had the continuance motion been granted). Respondent-mother also fails to identify in her brief any evidence, defenses, or testimony she was unable to present. Given the nature of a permanency planning

hearing, as defined by statute, respondent was on notice that she needed to present all evidence relevant to her arguments concerning the proper disposition. Therefore, based upon the record before us, we conclude respondent-mother has failed to demonstrate prejudice. She has not demonstrated how her case would have been better prepared, or a different result obtained, had a continuance been granted. In these circumstances, the trial court did not err by proceeding with the hearing and respondent-mother's due process rights were not violated.

¶ 14        We next consider respondent-mother's arguments that the trial court erred by failing to make the factual findings required by N.C.G.S. § 7B-906.2 when eliminating reunification with respondent-mother from the juveniles' permanent plan. This Court's review of a permanency planning review order "is limited to whether there is competent evidence in the record to support the findings [of fact] and whether the findings support the conclusions of law." *In re L.M.T.*, 367 N.C. 165, 168 (2013) (quoting *In re P.O.*, 207 N.C. App. 35, 41 (2010)). "The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *Id.* (citing *In re P.O.*, 207 N.C. App. at 41). "At a permanency planning hearing, '[r]eunification shall be a primary or secondary plan unless,' *inter alia*, 'the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.'" *In re J.H.*, 373 N.C. 264, 267 (2020) (quoting N.C.G.S. § 7B-906.2(b) (2019)). When making such a determination, the trial court must make

written findings "which shall demonstrate the degree of success or failure toward

reunification," including:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C.G.S. § 7B-906.2(d) (2019). While "use of the actual statutory language [is] the

best practice, the statute does not demand a verbatim recitation of its language." *In

re L.M.T.*, 367 N.C. at 167. Instead, "the order must make clear that the trial court

considered the evidence in light of whether reunification would be futile or would be

inconsistent with the juvenile's health, safety, and need for a safe, permanent home

within a reasonable period of time." *Id.* at 167–68 (cleaned up).

Here, despite respondent-mother's claims to the contrary, the trial court made

written findings of fact in accordance with N.C.G.S. § 7B-906.2(d). The trial court

found the following as fact:

> 6. That the Court has received testimony from Bethany Wyatt (Madison County DSS); the respondent mother; and has considered the DSS Report; the GAL Report; and other documentation; that since these matters were last reviewed, the juveniles have remained placed in licensed foster care in Madison County; are doing well in placement

and school; referrals for therapy have been made; the respondent mother has not secured or maintained independent housing; currently resides with her parents; testified she was kicked out of her prior residence in March, 2019; missed scheduled visitation on 04/05/19; missed scheduled Mother's Day visitation; continues to use alcohol in violation of the prior Court Order; received a recent DWI charge that remains pending (0.15 on breathalyzer); is currently on probation for Breaking and Entering conviction; does not have stable transportation; previously completed over 90 hours of SAIOP at RHA but has not participated in the aftercare program as recommended; states that she has recently re-engaged in that therapy but the Court finds the documentation she has provided on this issue is not credible and the Court gives no weight to same; is now substituting alcohol for methamphetamine use; has not obtained a DV assessment (the respondent mother testified she has had difficulty finding a provider for this service although being ordered to do so since the dispositional hearing); states she has completed DV coursework; the Court does not find the same satisfies the requirement of the DV assessment and treatment; has not started the Seeking Safety course; has not completed the TRACES peer support program; . . . that the barrier to implementing the permanent plan remains [respondent-mother's] failure to complete [her] DSS case plan requirements[.]

7. That this matter came on for permanency planning hearing. . . [and] that the [c]ourt has considered all the evidence, including the progress made and the current barriers to implementing the designated permanent plan of reunification.

. . . .

9. That the return of the juveniles to the home of [respondent-mother] immediately or within six months is not likely; that reunification is no longer the appropriate permanent plan for the juveniles[.]

. . . .

11. That the following services have been provided by the Petitioner to prevent or eliminate the need for placement of the juveniles and to place the juveniles in a timely manner in accordance with the permanent plan: facilitation of visits for respondent mother; referral to RHA for respondent mother; [and] coordination with respondent mother and case planning activities[.]

12. That reasonable efforts have been made by the Petitioner to prevent or eliminate the need for placement of the juveniles but the return of the juveniles to the home of the respondent parents is contrary to their welfare and best interests at this time.

13. That further reasonable efforts [to] prevent or eliminate the need for placement of the juvenile[s] are no longer required as the same would be clearly futile or inconsistent with the juveniles' need for a safe, permanent home within a reasonable period of time and are no longer required.

Respondent-mother does not claim that these findings are unsupported by the evidence, and we are bound by them on appeal. *See In re T.N.H.*, 372 N.C. 403, 407 (2019) (stating that "[f]indings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal."). Based on these findings of fact, the trial court relieved DSS of further reunification efforts and removed reunification from the juveniles' permanent plan.

¶ 16     The trial court's findings of fact establish that it addressed each of the factors specified in N.C.G.S. § 906.2(d). Finding of fact number 6 sets forth numerous details demonstrating that respondent-mother had not been making adequate progress or

actively participating in her case plan and had been acting in a manner inconsistent with the juveniles' health or safety. The trial court found as fact that respondent-mother had failed to maintain stable housing and transportation; had continued using alcohol in violation of prior court orders and as a substitute for methamphetamine use; had missed scheduled visitations; was recently charged with DWI and was on probation for a breaking and entering conviction; and had failed to provide documentation regarding her participation in substance abuse aftercare treatment and domestic violence counseling. *Cf.* N.C.G.S. § 7B-906.2(d)(1), (4) (2019). The trial court further found that the barrier to implementing the permanent plan of reunification was respondent-mother's failure to complete her case plan requirements. *Cf.* N.C.G.S. § 7B-906.2(d)(2) (2019). The trial court's additional findings, including the trial court's summation of respondent-mother's testimony, and its finding that DSS coordinated with respondent-mother when providing services aimed at eliminating the need for placement, demonstrated that respondent-mother remained available to the trial court and DSS. *Cf.* N.C.G.S. § 7B-906.2(d)(3) (2019). While the trial court's findings did not use the precise statutory language, the findings did address the necessary statutory factors "by showing 'that the trial court considered the evidence in light of whether reunification would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time[.]'" *In re L.E.W.*, 375 N.C. 124, 133 (2020) (quoting

*In re L.M.T.*, 367 N.C. at 167–68). Therefore, we reject respondent-mother's argument that the trial court failed to make sufficient findings of fact when eliminating reunification from the juveniles' permanent plan, and we affirm the trial court's permanency planning review order.

### III.    Termination Order

Respondent-mother next contends that the trial court erred in concluding that grounds existed to terminate her parental rights. "Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)). We review a trial court's adjudication of grounds to terminate parental rights "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, (2019).

The sole ground found by the trial court to support termination of respondent-

mother's parental rights was neglect. *See* N.C.G.S. § 7B-1111(a)(1). A trial court may terminate parental rights pursuant to this statutory ground where it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. *Id.* A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare . . . ." N.C.G.S. § 7B-101(15) (2019). In some circumstances, the trial court may terminate a parent's rights based on neglect that is currently occurring at the time of the termination hearing. *See, e.g.*, *In re K.C.T.*, 375 N.C. 592, 599–600 (2020) ("[T]his Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment."). However, in other instances, the fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.*, 373 N.C. 71, 80 (2019). In this situation, "evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights[,]" but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715 (1984). After weighing this evidence, the court may find the neglect ground if it

concludes the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841 (2020). Thus, even in the absence of current neglect, the trial court may adjudicate neglect as a ground for termination based upon its consideration of any evidence of past neglect and its determination that there is a likelihood of future neglect if the child is returned to the parent. *Id.* at 841, n.3. In doing so, the trial court must consider evidence of changed circumstances that may have occurred between the period of prior neglect and the time of the termination hearing. *In re Z.V.A.*, 373 N.C. 207, 212 (2019) (citing *Ballard*, 311 N.C. at 715).

¶ 19    Here, the juveniles were adjudicated neglected on 7 November 2018. The trial court also found as fact in its termination order that DSS received a report regarding respondent-mother and the juveniles, and during their first interview with respondent-mother "[s]he admitted to intravenous drug use, methamphetamine use, and domestic violence between she and [Mr. Scott]. She also admitted that [Mr. Scott] attempted to choke her in bed on one occasion." The trial court further found as fact that respondent-mother was given the opportunity to work toward reunification with the juveniles through compliance with a DSS case plan, but that she failed to comply. The trial court made the following findings of fact concerning respondent-mother's compliance with her case plan and concerning its determination that there would be a repetition of neglect should the juveniles be returned to respondent-mother's care:

> 24. At the time of the [May 16, 2019 permanency planning] hearing, the respondent mother had still not secured

independent housing; had missed scheduled visitations with the juveniles five times from September 2018 until the court date; was using alcohol; had been charged with Driving While Impaired (DWI) in May of 2019 with a blood alcohol concentration of 0.15, eight (8) months after the children came into the care of the Petitioner's custody; was placed on probation for Felony Breaking and Entering stemming from an incident in December of 2018; had not completed substance abuse treatment but was engaged with intensive outpatient substance abuse treatment ("IOP") and was providing negative urine drug screens to her provider; and had not gotten her domestic violence assessment, but completed domestic violence coursework on November 15, 2018. She had also completed the Children in the Middle parenting class on November 1, 2018. The respondent mother was unable to complete the Seeking Safety course due to a lack of funding to pay for the class.

25. By March 29, 2019, [respondent-mother] completed over 100 hours of IOP. She subsequently relapsed and was charged with her DWI offense in May of 2019. She then completed 36 hours of intermediate substance abuse treatment as recommended aftercare, ending on August 19, 2019. The respondent mother provided negative urine drug screens through the substance abuse provider.

. . . .

27. The respondent mother was on felony probation with a 6 to 17-month suspended sentence at the time she was charged with her pending DWI and was ordered not to consume alcohol as a probationary condition. She now has a pending felony probation violation as a result. The respondent mother was also engaged in substance abuse treatment for nine hours per week through RHA at the time of her DWI offense. The respondent mother testified that she does not currently have a driver's license and she anticipated she will lose her license once convicted of the DWI. Per the testimony of the respondent mother's

probation officer, except for the violation relating to her pending DWI and possession of alcohol, the respondent mother is otherwise fully compliant and has provided consistent negative urine drug screens.

28. Since coming into the Petitioner's custody on September 7, 2018, the juvenile [Holden] has made disclosures of a long pattern of alcohol and substance abuse by the respondent mother as well as patterns of domestic violence in his presence between the respondent mother and her multiple romantic partners throughout his childhood. In addition to the initial disclosures regarding [Mr. Scott], [Holden] has described observing the respondent mother and [Bella's putative father, R.M.] getting drunk and fighting all the time, the respondent mother breaking a bottle over [R.M.'s] head, [R.M.] beating [Holden] with a belt with spikes, and receiving a beating from [R.M.] during an argument about eating beans that was so bad that [Holden] can no longer eat beans. The respondent mother acknowledged that [R.M.] did beat [Holden] because of beans and testified that this incident triggered her to leave [R.M.].

29. Both juveniles have been admitted for inpatient psychiatric treatment at Copestone since coming into the Petitioner's custody, in part as a result of behaviors exhibited in reaction to the respondent mother and the situations she has exposed them to.

30. The respondent mother . . . came to Copestone in April 2019 when [Bella] was being assessed for admission. While at the hospital, a social worker from [DSS] smelled alcohol on the respondent mother and requested that she submit to a breathalyzer. The respondent mother agreed, then stated she was going to the restroom and left the premises without submitting to a breathalyzer and without waiting to see if [Bella] was going to be admitted. The following day, she acknowledged to [a] social work supervisor [ ] that she had been drinking.

31. The respondent mother [ ] has admitted to employees

of the Petitioner that she replaced methamphetamine with alcohol after [DSS] took custody of the juveniles.

32. [Bella] was diagnosed with Static Encephalopathy, alcohol exposed, following testing by the Olsen Huff Center, which was caused by the respondent mother consuming alcohol while pregnant with [Bella]. The diagnosis indicates that [Bella] has suffered irreversible brain damage and will have life-long effects due to her exposure to substances while in utero.

33. [Holden] has been increasingly struggling with negative behaviors since coming into the custody of the Petitioner on September 6, 2018. He has had uncontrollable fits of crying and yelling; has run away from placement providers and had to be returned by law enforcement; and has had to be transported to a children's crisis center and a psychiatric inpatient unit due to his behaviors.

. . . .

35. [Holden] has increasingly resisted visiting with the respondent mother. He initially claimed sickness on his visitation days with the respondent mother and missed multiple visits from July until September 2019. At his last visit with the respondent mother in September 2019, he became extremely upset and engaged in self-harming behaviors including beating his head into the wall until he had to be taken outside and the visit ceased. He has directly stated to the respondent mother that he never wants to live with her and he blames her for the things she has put him through.

36. With the consent of all parties, the [c]ourt interviewed [Holden] in chambers . . . . [Holden] stated and the [c]ourt finds that [Holden] does not want to return to the custody of the respondent mother due to the experiences she has put him through.

37. [Bella] participates in therapy . . . weekly. The therapist

does not support returning [Bella] to the care of respondent mother [ ] due to the behaviors exhibited by the juvenile and the unreliable environment provided by the respondent mother.

38. While the [c]ourt acknowledges that the respondent mother has made some progress on her case plan tasks, much of this progress occurred subsequent to the filing of the Petitions to terminate her parental rights in these causes. The respondent mother completed her domestic violence education classes prior to having an assessment of her level of need, and she has not completed additional classes after her assessment despite the assessment stating she is at high risk.

39. While the [c]ourt recognizes the respondent mother's recent participation in substance abuse treatment, her long-standing history of substance abuse and domestic violence with multiple partners in the presence of the children, her delayed participation in any meaningful treatment, her prior relapse while participating in similar services, the traumatic effects and impact on the children from her behaviors, and the diagnoses, behaviors, and wishes of the children all demonstrate the juveniles' continued neglect and the strong likelihood of neglect if returned to the respondent mother's custody.

To the extent these findings of fact are not challenged by respondent-mother, they are binding on appeal. *See In re T.N.H.*, 372 N.C. at 407.

Although respondent-mother does not argue that finding of fact 31 is unsupported by clear, cogent, and convincing evidence, she nonetheless contends the trial court's "concerns" about her substitution of alcohol for her prior drug use are unsupported. A review of the record shows that there is a factual basis for the trial court's concerns.

¶ 21          The record is replete with instances of respondent-mother's abuse of alcohol, both in the short-term and long-term. The trial court found that when Bella was being considered for admission to Copestone in April 2019, respondent-mother arrived smelling of alcohol, and despite agreeing to take a breathalyzer test, she left without taking one. Additionally, respondent-mother was arrested for DWI in May 2019, which also constituted a violation of the term of her probation requiring that she abstain from alcohol use. Holden also disclosed that respondent-mother had "a long pattern" of alcohol abuse. Furthermore, the trial court found that respondent-mother's history of alcohol abuse had a direct and deleterious impact on Bella. Bella was diagnosed with static encephalopathy, alcohol exposed, and suffered irreversible brain damage due to respondent-mother consuming alcohol while she was pregnant with Bella. Thus, the trial court could reasonably infer that respondent-mother had merely replaced her abuse of drugs with alcohol abuse. *See In re D.L.W.*, 368 N.C. 835, 843 (2016) (stating that it is the trial court's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom).

¶ 22          Respondent-mother additionally argues that the trial court relied solely on past circumstances and mistakenly discounted evidence of progress occurring after the filing of the petition to terminate her parental rights. Respondent-mother asserts that while she did not complete all aspects of her case plan, at the time of the

termination hearing she had made sufficient progress towards being able to care for

Holden and Bella.

¶ 23        It is apparent from the trial court's findings of fact that when determining

whether there would be a likelihood of future neglect, the trial court placed heavy

emphasis on incidents occurring prior to the filing of the petition to terminate

respondent-mother's parental rights in June 2019. However, despite respondent-

mother's arguments to the contrary, the trial court also specifically stated that it

considered respondent-mother's "recent participation in substance abuse treatment"

when determining that there likely would be a repetition of neglect. The trial court

ultimately determined, however, that respondent-mother's last-minute progress was

insufficient to outweigh her long-standing history of alcohol and substance abuse and

domestic violence, as well as the impact these behaviors had on Holden and Bella. In

these circumstances, we conclude that it was not error for the trial court to find that

there likely would be a repetition of neglect in the future should Holden and Bella be

returned to respondent-mother's care. *See In re O.W.D.A.,* 375 N.C. 645, 653–54

(2020) (stating that "evidence of changed conditions must be considered in light of the

history of neglect by the parents and the probability of a repetition of neglect," and

although a respondent may have made some recent, minimal progress, "the trial court

was within its authority to weigh the evidence and determine that these eleventh-

hour efforts did not outweigh the evidence of his persistent failures to make

improvements . . . and to conclude that there was a probability of repetition of neglect[.]"). Accordingly, we hold that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(1) to terminate respondent-mother's parental rights.

¶ 24        We next consider respondent-mother's argument that the trial court erred by finding that it was in Holden's and Bella's best interests to terminate her parental rights. If the trial court finds grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest" based on the following factors:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019).

¶ 25        Here, the trial court made separate findings of fact addressing each juvenile's date of birth and then made the following findings concerning the factors set forth in N.C.G.S. § 7B-1110(a):

54. The juveniles' permanent plan has been designated [as] adoption, and there is a strong likelihood of adoption due to the age of the juveniles. Termination of the [respondent-mother's] parental rights would assist the Petitioner in achieving permanency for the juveniles and would eliminate this barrier to implementing the juveniles' permanent plan.

55. [Bella] has a bond with the Respondent Mother. [Bella] enjoys her visits with the Respondent Mother.

56. [Holden] is not bonded to the Respondent Mother and continues to actively resist having any contact with her, with his last visit occurring [in] July 2019.

57. The minor children were placed in a new foster home together on August 13, 2019. They remained in the same foster home until October 18, 2019, when [Holden] was removed to a separate home due to his behaviors. They now reside in separate foster homes, neither of which are pre-adoptive placements.

58. [DSS] is actively attempting to locate a new foster home for both children that will adopt them together, but no such home has been identified as of yet.

59. [Bella] was involuntarily committed into the Copestone mental health unit of Mission Hospital in April 2019, due to her behavior.

60. [Holden] was involuntarily committed into the Copestone mental health unit of Mission Hospital on July 26, 2019, due to his behavior. His hospitalization lasted for two weeks.

We review the trial court's dispositional findings of fact to determine whether they are supported by competent evidence. *In re K.N.K.*, 374 N.C. 50, 57 (2020). Dispositional findings not challenged by respondent-mother are "binding on appeal."

*In re Z.L.W.*, 372 N.C. 432, 437 (2019).

¶ 26        Respondent-mother contends that while the trial court "nominally" addressed the statutory factors set forth in N.C.G.S. § 7B-1110, the findings were "pro forma" and did not address the substance of the statutory requirements. Respondent-mother asserts that consideration of Holden's and Bella's best interests weigh strongly against termination of her parental rights. Respondent-mother cites the strong bond that she had with Bella, the trial court's failure to consider whether Holden would consent to adoption, and the fact that neither juvenile was in a pre-adoptive placement. Respondent-mother cites *In re J.A.O.*, 166 N.C. App. 222, 227 (2004) to support her contention that the trial court should not have terminated her parental rights because Holden and Bella were not adoptable.

¶ 27        However, in this case, the trial court's findings of fact were not merely "pro forma." The trial court did not simply recite the statutory factors but considered them along with the facts of this case. For example, the trial court noted that Holden did not have a bond with respondent-mother and "actively resists having any contact with her." The trial court also found that Bella did have a bond with respondent-mother and enjoyed her visits with her. Furthermore, while the trial court found that there was a strong likelihood of adoption and termination would aid in achieving permanency, the trial court also recognized that the juveniles were not in pre-adoptive placements and were residing in separate foster homes, while noting that

DSS was attempting to locate a new foster home that would adopt both juveniles together. Thus, respondent-mother's contention that the trial court only nominally addressed the statutory factors set forth in N.C.G.S. § 7B-1110 is without merit.

¶ 28    Second, although respondent-mother does not challenge the trial court's finding of fact 54 that there was a strong likelihood of adoption as being unsupported by the evidence, she nonetheless argues that adoption would be difficult, noting the juveniles' multiple disrupted foster placements, the fact that no pre-adoptive home has been identified, and the fact that both juveniles had been involuntarily committed for being a danger to themselves and others. Respondent-mother also contends that the trial court failed to consider whether Holden would consent to adoption. *See* N.C.G.S. § 48-3-601(1) (2019) (providing that a minor over the age of twelve must consent to adoption unless consent is not required under N.C.G.S. § 48-3-603). However, even if we agreed with respondent-mother's contentions regarding the adoptability of the juveniles, this factor alone is not dispositive. We have stated that "the trial court need not find a likelihood of adoption in order to terminate parental rights." *In re C.B.*, 375 N.C. 556, 562 (2020); *see also In re A.R.A.*, 373 N.C. 190, 200 (2019) ("[T]he absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights." (alteration in original) (quoting *In re D.H.*, 232 N.C. App. 217, 223 (2014))).

¶ 29    Furthermore, *In re J.A.O.,* cited by respondent-mother, is readily

distinguishable from the instant case. In *In re J.A.O.*, the juvenile had "a history of being verbally and physically aggressive and threatening, and he ha[d] been diagnosed with bipolar disorder, attention deficit hyperactivity disorder, pervasive developmental disorder, borderline intellectual functioning, non-insulin dependent diabetes mellitus, and hypertension." *In re J.A.O.* 166 N.C. App. at 228. The juvenile had "been placed in foster care since the age of eighteen months and ha[d] been shuffled through nineteen treatment centers over the last fourteen years." *Id.* at 227. As a result, the guardian ad litem argued at trial that the juvenile was unlikely to be a candidate for adoption and that termination was not in the juvenile's best interests because it would "cut him off from any family that he might have." *Id.* at 228. Despite this evidence, and despite finding that there was only a "small 'possibility' " that the juvenile would be adopted, the trial court concluded that it was in the juvenile's best interests to terminate the mother's parental rights. *Id.* On appeal, the Court of Appeals reversed. The Court of Appeals balanced the minimal possibilities of adoption "against the stabilizing influence, and the sense of identity, that some continuing legal relationship with natural relatives may ultimately bring" and determined that rendering *J.A.O.* a legal orphan was not in his best interests. *Id.*

¶ 30    Here, the juveniles have only been in foster care for thirteen months, as opposed to the many years that *J.A.O.* spent being "shuffled" through various treatment centers. *Id.* at 227. Additionally, while the guardian ad litem in *J.A.O.*

argued that the juvenile was unlikely to be adopted and termination was not in his best interests, the guardian ad litem here stated in its report that "there is potential for both children to be successfully adopted" and advocated for termination to achieve permanence for Holden and Bella. A social worker likewise testified that she had "every hope . . . that [Holden and Bella] can be adopted together." Furthermore, while Bella did have physiological issues and both juveniles had behavioral issues that required their involuntary commitment, there is no indication that their issues were as serious as those experienced by the juvenile in *J.A.O. Id.* at 228. We note that a social worker testified that Holden had been moved to a new foster home and "is doing great and [has] no behavior problems. He loves it there and he gets along great with the foster dad." Moreover, as noted previously, Bella's physiological issues and both juveniles' behavioral issues can be directly attributable to respondent-mother. Consequently, respondent-mother's argument concerning the likelihood of the juveniles' adoption and the significance of that consideration in the best interests' determination is unavailing.

¶ 31    Third, respondent-mother does not challenge the trial court's dispositional finding that Holden was not bonded to her as being unsupported by the evidence. Respondent-mother instead argues that a "more accurate finding would be that he was angry with his mother. If he wasn't bonded, he wouldn't have been angry – he wouldn't have cared." However, a social worker testified that Holden "blames his

mom for everything that he's already been through and that he hates her and doesn't want to live with her." Based on this evidence, the trial court could reasonably infer that Holden had no bond with respondent-mother. *See In re D.L.W.*, 368 N.C. at 843 (stating that it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom).

¶ 32      Additionally, while respondent-mother may have maintained a bond with Bella, this Court has repeatedly recognized that "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. at 437. This Court concluded in *In re Z.L.W.* that, based on the trial court's consideration of the other statutory factors and given the respondent's lack of progress on his case plan, "the trial court's determination that other factors outweighed [the] respondent's strong bond with [the juveniles] was not manifestly unsupported by reason." *Id.* at 438.

¶ 33      Similarly, here, it was not an abuse of discretion for the trial court to determine that other factors outweighed respondent-mother's bond with Bella. There was evidence to show that Bella is likely to be adopted, and that termination of respondent-mother's parental rights was necessary to achieve permanence. Accordingly, we conclude that the trial court properly considered the statutory factors

set forth in N.C.G.S. § 7B-1110(a) and did not abuse its discretion by determining that termination of respondent-mother's parental rights was in the best interests of the juveniles.

## IV. Conclusion

The trial court did not err by failing to grant respondent-mother a continuance of the 16 May 2019 permanency planning review hearing and the trial court made sufficient findings of fact when eliminating reunification from the juveniles' permanent plan. Furthermore, the trial court properly concluded that grounds existed to terminate respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1). Finally, the trial court did not abuse its discretion by determining that termination of respondent-mother's parental rights was in the best interests of the juveniles. Accordingly, we affirm the trial court's orders.

AFFIRMED.